UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


SHAW CONSTRUCTORS, INC.

CIVIL ACTION

VERSUS

NUMBER 99-254-SCR

ICF KAISER ENGINEERS, INC.,
ET AL

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Fifth Circuit Court of Appeals decision in *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533 (5th Cir. 2004), *cert.denied*, 546 U.S. 816, 126 S.Ct. 342 (2005), and the Ruling on Motion in Limine filed August 17, 2006,[1] as well as earlier rulings, contain detailed summaries of the background and history of this case.  For the purpose of this ruling only a brief review is required.

### A Brief Review

Defendant PCS Nitrogen Fertilizer, L.P. (PCS) entered into a contract with ICF Kaiser Engineers, Inc. and Henry J. Kaiser Company (collectively, Kaiser) to design and construct a project called the 1265 STPD Nitric Acid Facility at the PCS nitrogen plant near Geismar, Louisiana.  Kaiser did not furnish a bond and notice of its contract with PCS was not recorded.  Kaiser then subcontracted a large portion of the project to plaintiff Shaw

---

[1] Record document number 122.

Constructors, Inc., pursuant to a lump sum written subcontract for the piping and mechanical equipment installation, absorption tower, stack erection and underground piping.  In the summer of 1998, Kaiser and Shaw renegotiated their subcontract and executed a change order, Change Order No. 1, which provided that work performed after August 3, 1998 through contract completion would be compensated on a time and materials basis as specified in the exhibits to the change order.

The revised December 4, 1998 completion date could not be met and construction of the project continued into January 1999. Kaiser was far behind in paying Shaw's invoices and Shaw contemplated stopping its work on the job.  However, before any action was taken by Shaw, Kaiser sent Shaw a letter terminating Shaw's work on the project as of January 29, 1999.  The project was completed by the end of February and the first acid was produced in March 1999.

After leaving the project at Kaiser's request, Shaw took steps to recover the money it was owed for the work performed on the PCS project. On January 27, 1999, Shaw recorded two statements of claim, lien and privilege against PCS in the parishes of Iberville and Ascension.  Shaw recorded amended and supplemental lien affidavits and statements of claim and privilege against PCS in the same two parishes on February 17, 1999.

On February 23, 1999, Shaw filed suit against PCS and Kaiser

in state court and the action was removed to this court on March 18, 1999.  Kaiser and Shaw entered into a Compromise Agreement on April 1, 1999.  The agreement required Kaiser to make payments to Shaw, but Shaw did not waive any claim against PCS.  After making partial payments to Shaw, Kaiser discontinued payments under the Compromise Agreement and filed a bankruptcy proceeding in June 2000.  With Kaiser in bankruptcy, Shaw pursued its claim against PCS under the Louisiana Private Works Act (LPWA) to recover the remaining amount Shaw contends it is owed for the work performed on the PCS project.

The Fifth Circuit recognized the validity of Shaw's claim and privilege under the LPWA against PCS personally, and against its property where Shaw's work was performed, "for the amounts to be determined in further proceedings consistent with this opinion, and for the assessment of all costs of these proceedings against PCS."[2] Pursuant to the Fifth Circuit's decision, a bench trial was held June 25-29, 2007 and July 20, 2007 for the presentation of evidence on the issue of the amount that Shaw can recover from PCS under the LPWA for the work it performed on the project.

## Summary of Findings

Considering all the testimony and documents admitted in evidence, the court finds by a preponderance of the credible

---

[2] *Shaw Constructors*, 395 F.3d at 555.

3

evidence that Shaw proved:

(1)  the reasonable and necessary cost of the work Shaw performed on the project totaled $11,631,045.20;

(2)  Shaw and Kaiser mutually agreed to exceed the NTE amount stated in Change Order No. 1;

(3)  under the LPWA Shaw is entitled to recover from PCS the balance owed for the price of its work under the subcontract and Change Order No. 1;

(4)  the balance owed by PCS for the price of Shaw's work is $5,238,217.90;

(5)  PCS is entitled to a credit of $3,783,157.43 for payments made by Kaiser pursuant to the Compromise Agreement; and,

(6)  Shaw is entitled to recover prejudgment interest on the net amount owed by PCS - $1,455,060.47 - from February 23, 1999, which is the date of judicial demand.

## **Applicable Law**

Shaw's right to recover from PCS is governed by the LPWA. Under LSA-R.S. 9:4802.A.(1) subcontractors have a claim "for the price of their work." Shaw convincingly argued in the Motion in Limine that the price of its work is determined in accordance with the terms of the subcontract. Thus, in order to determine the amount that Shaw can recover for the price of its work under the LPWA the court must look to the subcontract between Shaw and Kaiser.

4

The terms of the subcontract and the amendments to it are undisputed. The subcontract change order executed in October 1998 changed the contract under which Shaw performed its work from a lump sum to a cost-plus agreement.[3] Change Order No. 1 contained the following payment terms governing work commencing August 3, 1998 through the completion of the contract:

> As compensation for the remaining Subcontract Work, commencing as of the start of business on August 3, 1998 through Project completion, the Subcontractor will be reimbursed for reasonable and necessary costs associated with Direct and Indirect Labor, Labor Incentives, Materials, Pipe Fabrication Costs, Subcontractor Owned Equipment, Lower Tier Subcontracts and certain Overhead costs as outlined below.
>
> Furthermore, a Not-to-Exceed (NTE) total amount of $7,677,918.00 (Seven million six hundred seventy-seven thousand nine hundred eighteen and 0/100 dollars) has been established for compensation of costs incurred during the performance of all of the work associated with this Subcontract. It is mutually understood by the parties that the NTE amount may have to be adjusted if reasonable and necessary costs incurred during the performance of the work exceed the total NTE amount. If Contractor observes Subcontractor invoicing for, performing or reporting work which falls outside of "reasonable or necessary", Contractor will endeavor to transmit this information to the Subcontractor within 7 days of witnessing the non-conforming work so that billing or field work corrections can be made.[4]

---

[3]    Subcontract No. 67856-3003, January 16, 1998. Joint Exhibit 2. The initial lump sum subcontract total was $5,063,882. The contract was signed by Ronald Volentine, Shaw's Project Manager for the PCS project and Bonnie L. Marsh and Russell Yester for Kaiser.

[4] Subcontract Change Order No. 1 dated October 1, 1998, signed by Volentine, and Yester, Kaiser's Procurement Manager. Joint Exhibit 5.

5

Based on these provisions, the parties do not dispute that
Change Order No. 1 stated an NTE amount and provided that Shaw's
work under the subcontract from August 3, 1998 through completion
would be compensated on a cost-plus basis.  In Louisiana, when a
contractor seeks payment based on a cost-plus agreement the
contractor has the burden of proof.

> A "costs plus" (costs plus percentage of costs) contract,
> or a "percentage" contract, is a construction contract in
> which the owner agrees to reimburse the contractor for
> the costs of material and labor and to pay a percentage
> of those costs as his profit....When a contractor asserts
> a claim on a "costs plus" contract and the owner denies
> being indebted to the contractor, the contractor has the
> burden of proving each item of expense in connection with
> the job and he must itemize each expenditure made by him.

*Burdette v. Drushell*, 2001-2494 (La.App. 1 Cir. 12/20/02), 837
So.2d 54, 59, *writ denied*, 2003-0682 (La. 5/16/03), 843 So.2d 1132.

The change order maintained the unaltered portions of the
initial contract, and the initial contract required that any
amendment, variance or change in the provisions of the subcontract
be made in writing and signed by the authorized representatives of
the parties.[5]

However, Louisiana law also provides:

> A contract may be modified only by mutual consent.  While
> modification can be presumed by silence, inaction, or
> implication, one person may not change the terms
> unilaterally....[W]ritten contracts for construction may
> be modified by oral contracts and by the conduct of the
> parties, and this is true even when the written contract
> contains the provision that an owner is liable only if

---

[5] Joint Exhibit 2, Exhibit C, p. 23.

the change orders are in writing.  It is a question of
fact, therefore, as to whether there were oral agreements
that modified the written contract.

*L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc.*, 1999-0354
(La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1232 (internal citations
omitted), *writ denied*, 2000-2232 (La. 11/13/00), 775 So.2d 438.[6]

In a diversity case, whether to award prejudgment interest is
governed by state law.[7]  Under the LPWA, a subcontractor's claim
granted by LSA-R.S. § 9:4802 secures payment of the principal
amount of the obligation, interest due thereon, and fees paid for
filing the statement required by LSA-R.S. § 9:4822.  LSA-R.S. §
9:4803.A(1).  The LPWA does not state the date from which interest
is due.  In the absence of any specific provision under the LPWA,
guidance is provided by the jurisprudence and Louisiana Civil Code
Article 2000.

Louisiana Supreme Court decisions which have cited *Alexander
v. Burroughs Corp.*[8] and expounded on the civil law concept of

---

[6] *See also*, *Wisinger v. Casten*, 550 So.2d 685 (La.App. 2 Cir.
1989); *Cajun Constructors, Inc. v. Fleming Const. Co., Inc.*, 2005-
2003 (La.App. 1 Cir. 11/15/06), 951 So.2d 208, *writ denied*, 2007-
0420 (La. 4/5/07), 954 So.2d 146.

[7] *Concise Oil & Gas Partnership v. Louisiana Intrastate Gas
Corp.*, 986 F.2d 1463, 1472 (5th Cir. 1993).  Under 28 U.S.C. §
1961(a), in diversity cases, post-judgment interest is calculated
at the federal rate, while pre-judgment interest is calculated
under state law.  *Boston Old Colony Ins. Co. v. Tiner Associates
Inc.*, 288 F.3d 222, 234 (5th Cir. 2002).

[8] 359 So.2d 607 (La. 1978).  *Alexander* was a redhibition case
that involved Louisiana Civil Code Articles 1935 and 1938.  The
substance of these articles were later included in Louisiana Civil
(continued...)

7

prejudgment interest make it clear that prejudgment interest is not a penalty.  Rather, it is awarded to make an injured party whole by compensating that party "for the time-value of money to which that party was entitled ... but over which the defendant, in retrospect, had wrongfully continued to exercise dominion and control while the suit was pending."[9]  Thus, under Louisiana Civil Code Article 2000 and the relevant case law, in order for a debt to be due, the exact amount due does not have to be ascertained prior to judgment.  The fact that the precise amount is disputed or unknown during the pendency of a suit, and the amount due is not determined until the date of judgment, has no effect on the fact that the defendant had the use of money to which the plaintiff was entitled since the date of judicial demand.

The parties did not cite and the court did not find any controlling decisions that directly address when legal interest begins to accrue under LSA-R.S. § 9:4803.A(1).  In *Paul M. Davison*

---

[8](...continued)
Code Article 2000.

[9] *Sharbono v. Steve Lang & Son Loggers*, 97-0110 (La. 7/1/97), 696 So.2d 1382, 1387-88, citing, *Alexander v. Burroughs Corp.*, (court discussed concept of "due" in the context of determining when interest begins to run on awards of attorney's fees under worker's compensation laws); *Trans-Global Alloy Limited v. First National Bank of Jefferson Parish*, 90-1848 (La. 6/21/91), 583 So.2d 443, 457-59 (civil law views prejudgment interest as reparation for creditor's loss of use of his money, whereas punitive common law view is to allow prejudgment interest only when the amount owed is either liquidated or readily ascertained by simple computation); *see also*, *David Y. Martin, Jr., Inc. v. Heublein, Inc.*, 943 F.Supp. 637, 643 (E.D. La. 1996).

*Petroleum Prods v. L.T. Brown Contractor, Inc.*,[10] a case under the Public Works Act, the Louisiana Supreme Court held that interest should run from the date the debt became due, which was the date the sworn statement of the amount due was filed and recorded. Citing *Davison*, a Louisiana appellate court made the same finding in a case involving the Louisiana Private Works Act. *T.N.T. Drywall Supplies, Inc. v. Booth*, 487 So.2d 614, 616 (La.App. 4 Cir. 1986). Without any discussion, in *Kenner Industries, Inc. v. Sewell Plastics, Inc.*, 451 So.2d 557, 561 (La. 1984), the Louisiana Supreme Court entered judgment against a general contractor and an owner under the LPWA, and awarded legal interest from the date of demand. Similarly, in *Jefferson Door* the appellate court noted that the trial court had awarded legal interest from the date of judicial demand.[11]

In summary, Louisiana Supreme Court and appellate court decisions indicate that interest should either be awarded from the date of filing of the sworn statement of amount due or the date of judicial demand.

<u>**Analysis**</u>

**The price of Shaw's work**

The factual findings are based in large part on the testimony

---

[10] 364 So.2d 583, 585 (La. 1978). In *Davison* the court cited and relied on Louisiana Civil Code Articles 1935 and 1938, the forerunners of Louisiana Civil Code Article 2000.

[11] 836 So.2d at 553.

of Joel Rivers.  Rivers' position in this case is unique.  He is currently employed by defendant PCS as a senior project manager. Rivers testified on behalf of PCS in a Rule 30(b)(6), Fed.R.Civ.P. deposition and at trial, and was PCS's corporate representative at trial.  However, during the time period relevant to this litigation he was employed by Kaiser as its construction site manager for the PCS project.  In this role his primary responsibility was overseeing all the subcontractors involved in the construction of the plant and he had complete responsibility for ensuring the efficient completion of the project.[12]

Rivers' unique position and knowledge of Shaw's work on the project support the conclusion that his testimony about the situation at the job site and the progress of the work performed by Shaw is, in large part, credible and entitled to the most weight.

The trial testimony of Ronald Volentine,[13] Rivers, Edgar Randol, and Charles Graves is generally consistent regarding the project as a whole and the work undertaken by Shaw.  For the reasons already explained, Rivers' testimony is cited because he was on the job daily from the beginning to the end of the project. The testimony of Volentine, Randol and Graves is also cited because

---

[12] Vol. 1, p. 8; Rivers, Vol. 4, p. 170; Shaw Exhibit 43, Rivers deposition.

[13] Volentine is currently employed by Shaw as vice-president of construction.  He was Shaw's project manager for the PCS Geismar project, and the Baytown, Texas project that was also being built by Kaiser.  The projects were going on in approximately the same time frame.  Volentine, Vol. 1, pp. 22, 98.

it generally supports Rivers' account of the course of the project. Individuals associated with Kaiser, PCS and Shaw who testified more about the financial aspects of the price of Shaw's work, are cited later in the analysis.[14]

Kaiser had a lump sum, schedule-driven contract for construction of the PCS Geismar nitric acid project. The initial completion date was September 4, 1998.[15] Kaiser was the construction manager and had responsibility and control over all of the engineering aspects of the project. Kaiser provided the site management and engineering drawings, and used subcontractors to do the actual construction of the plant. Shaw had the largest subcontract, which was for the piping/mechanical portion of the work, including responsibility for equipment erection, underground piping, pipe fabrication, pipe erection, hydrotesting and nondestructive testing.[16]

Kaiser had significant problems providing timely and adequate engineering drawings which Shaw and the other subcontractors needed to complete the work on the project. Kaiser's failure in engineering began at the inception of the project. The initial

---

[14] A transcript of the trial was filed in the record. Record document numbers 208 and 215. Therefore, there is no need to present a summary of all the evidence. The analysis and findings are based on all the evidence. For the purpose of illustration or emphasis, relevant portions of the testimony and exhibits will be cited, but are not intended as an exclusive list of all the evidence relied upon.

[15] Rivers, Vol. 4, p. 174; Joint Exhibit 1.

[16] Rivers, Vol. 4, pp. 175-76.

subcontract stated that drawings for all piping 16 inches and larger would be issued at contract award (January 16, 1998) and the release of all remaining drawings would occur each week over the following four weeks.[17]

Kaiser failed miserably. Instead, as Rivers testified:

> There was problems with the piping drawings and the release of piping drawings in a timely enough fashion early in the project. And so in order to try to alleviate some of the problems to allow Shaw to get piping materials done, we Kaiser Engineers, issued a lot of early drawings which had "Issue For Purchase Only." Okay? So now we have an extra issue on the job that we would have not normally had.[18]

Thus, the engineering drawings were not issued as they normally would be. Kaiser began by releasing drawings "For Purchase Only" so materials could be purchased. Kaiser also issued drawings for fabrication only so Shaw could start pipe fabrication. Then Kaiser supplied drawings for construction. As will be explained in more detail, Kaiser's design for the piping system and pipe supports was continuously being revised, and the bulk of the

---

[17] Joint Exhibit 2, Exhibit J; Rivers, Vol. 4, p. 180; Vol. 5, pp. 46-48. Reports from the project did not state that engineering was "complete" until December 1998. Clarence Philpot, Vol. 4, pp. 157-58. During the project, Philpot was an independent consultant for PCS, and he was in charge of schedule, cost and program monitoring, which included monitoring Kaiser and its subcontractor's schedules for completion of the construction. Philpot, Vol. 4, pp. 84-85.
William Kelly, one of PCS's experts, testified that the largest pipe used in the job was a short section of 60 inch pipe, and that the project included a fair amount of 56 inch pipe. Kelly stated that the installation of this large bore pipe is much more complex and extensive than the installation of small bore pipe. Kelly, Vol. 6, p. 126; Volentine, Vol. 6, p. 255.

[18] Rivers, Vol. 4, p. 179.

reissued drawings came in June, July, August and into September.

Because of the timing and method of issuing the drawings and revisions, Shaw's subcontract completion date of July 17, 1998 for the piping and mechanical part of the project could not be met. Instead of completing the entire project by September 1998, in September Shaw had only enough drawings to do substantial planning in the fabrication shop and at the job site.   The anticipated completion date slipped into December 1998.[19]

According to Rivers, Kaiser's engineering on the PCS project was "awful" – the worst he had been involved with in his 25 years in the construction industry.[20]   The deficiencies and failure of Kaiser's engineering on the project were echoed by Volentine, Graves and Randol.[21]

Randol, who was Rivers' supervisor on the PCS project, became involved in approximately July 1998.  At that time, changes in the design were happening so quickly that they were not being reflected or passed on to Shaw and other subcontractors.   Because of the massive changes in the design of the plant, fabricated pipe spools and other material bought by Shaw could not be used.   To keep the

---

[19] Rivers, Vol. 4, pp. 180-82; Clark Bailey, Vol. 3, p. 24. Bailey is currently vice president of capital and technology for PCS Nitrogen and PCS Phosphate.  At the time of the construction of the Geismar facility he was director of capital projects for PCS Nitrogen.  Bailey, Vol. 3, pp. 5-9.

[20] Rivers, Vol. 5, p. 68; Shaw Exhibit 43, Rivers depo., p. 162; Volentine, Vol. 6, p. 235.

[21] Randol was vice-president of ICF Kaiser Engineers.

job moving forward, a recommendation was made to continue working with Shaw on a time and materials basis until a date in the future when the drawings were fixed.[22]   When Randol assessed the PCS project before the execution of Change Order No. 1, the biggest issue was getting the engineering corrected.   Randol stated that basically "Kaiser's engineering was failing"; Kaiser was "floundering" and the project was not going well; "[t]he design of Kaiser was not up to par and causing fits, not just for Shaw but others."

Even after Change Order No. 1, when Randol and others from Kaiser made changes to move the project to completion, significant changes and difficulty with the engineering design continued. Kaiser's defective engineering and engineering errors had a substantial impact on the completion and the cost of the project. The time and cost to complete the job greatly increased.[23]

Charles Graves was a Kaiser program manager who reported directly to Randol.   In July 1998 he went with Randol to the PCS project in Geismar to attempt to address the problems and figure out a plan to move forward and finish the project as soon as possible.   With regard to Kaiser's engineering failures and the situation at the job site, Graves' testimony aligned with Randol's

---

[22] Randol testified that Kaiser was having "significant issues on the design of these plants." Shaw Exhibit 46, Randol depo., p. 28.

[23] Randol depo., pp. 25-26, 30-33, 42, 44, 96-97, 100-01; Volentine, Vol. 6, pp. 228-35.

observations.   The design still was not complete, and as Graves stated, "they were still chasing the design with no clear direction in the field on how to construct it."   At that time there was a huge disparity between the amount of work done and the amount of contract funds spent.

With regard to Shaw's work, pipe was put in and then pulled out, and then put back in, and pipe was fabricated that was never put in.   The number of design revisions was so great and so many things had changed that at the end of the project it was not the same project Shaw had contracted to work on.   The original lump sum subcontract with Shaw was for a design that was no longer valid. Kaiser was the cause of this debacle.   Shaw and Kaiser agreed to Change Order No. 1 as a way to keep moving forward with the project that was fair and equitable to both parties.

Thus, a preponderance of the credible evidence established that the root cause of the delay and cost overruns, including the substantial increase in the time and cost of Shaw's subcontract work, was Kaiser's late, deficient and error-filled engineering design.[24]

During the July, August and September time period Kaiser issued hundreds of revised pipe drawings that affected the

_____

[24] Shaw Exhibit 47, Graves depo., pp. 17-22, 26, 32, 68-71; Rivers, Vol. 5, pp. 111-12.  According to Graves, figuring out the cost of the work to date for Change Order No. 1 was a very complex problem, including  work that had been done previously and torn out, or pipe that had been fabricated but never used.   Graves depo., p. 34.

operations of Shaw's fabrication shop.  Many of the revisions required Shaw to procure additional materials.  When a revised drawing was received it took time to determine the current status of fabrication, the extent of the revision, and whether new materials were needed.  Additional time was spent on attempting to get the best price on materials, and to reorganize for work on the revised pipe spools.  Kaiser was also making substantial revisions to the piping drawings for the large bore pipe.  Obtaining the fittings and components for such large pipe could take a long time.  Pipe supports were being modified throughout the course of the job.[25]  A stress analysis of the piping system resulted in the determination that design errors had been made, which required other modifications in the design of the pipe supports.[26]

At the trial PCS tried to downplay the magnitude of the drawing revisions in July, August and September and the effects they had on the completion of the project.  But the evidence supports finding that they were root causes of the delay and extra cost on the project.  The combination of these events and circumstances were the impetus for Change Order No. 1, and changing

---

[25] Rivers, Vol. 5, pp. 53-61.  Rivers stated that Shaw had a very difficult time managing all of the changes and that the coordination between the fabrication shop and the field was poor. But he conceded that maybe the drawing revisions had something to do with it, and that the contract did not state that Kaiser would get priority in Shaw's the fabrication shop. *Id.*, pp. 51-53.

[26] Randol depo., pp. 103-04; Volentine, Vol. 1, pp. 45-50, 106-09, 207-08, 217-18, Vol. 6, pp. 228-35, 255; Philpot, Vol. 4, pp. 137-50; Bailey, Vol. 3, pp. 22-23.

from a lump sum to a cost-plus subcontract.[27]

Kaiser sent Rivers additional staff support and engineers to work with Shaw in an effort to reduce down time caused by the changes and the need for clarifications that arose in the field. Rivers told the Kaiser field engineers to keep their own as-built drawings as they went out and showed Shaw what to do.[28] Kaiser also made a decision to put a representative in Shaw's fabrication shop to expedite things and improve coordination between the shop and the field.

Shaw received approval from Kaiser to hire additional workers, and use a night shift and wage incentives in order to hasten the progress on the project. The completion date for the project became December 4, 1998. The purpose of all these measures through the fall and winter of 1998 was to finish the job as quickly as possible, and as Rivers stated, to stop "the bleeding."[29]

Moving into the implementation of the cost-plus agreement between Shaw and Kaiser coincided with the beginning of the assessment of liquidated damages by PCS against Kaiser, and the

---

[27] Rivers, Vol. 5, pp. 49, 54, 68; Randol depo., pp. 31-32.

[28] Rivers, Vol. 5, pp. 61-64; Vol. 4, pp. 194-95; Randol depo., pp. 37-38, 125-26. Rivers' testimony on this point is consistent with Volentine's statements about "hand wave" or field directed changes made by Kaiser engineers in the field. Volentine, Vol. 1, pp. 122-23, 129.

[29] Rivers, Vol. 4, pp. 204, 209, 215-16, 236; Vol. 5, pp. 24, 74, 112-13, 116-17.

decision to bring MEI on the job site.[30]  The record is replete with evidence of Kaiser's financial problems during the project.[31]  Kaiser was months behind schedule on both the PCS project in Louisiana and another project in Baytown, Texas.  Kaiser was having cash flow problems and difficulty making payments to its subcontractors.  This problem intensified in the fall of 1998 with the assessment of liquidated damages by PCS.[32]

Not surprisingly, the December completion date was not met and the work continued into January 1999.  Kaiser was not able to fulfill its promises to Shaw to make payments on past due invoices. Rivers became aware that Shaw intended to walk off the job because of nonpayment.  Rivers, in consultation with PCS and Kaiser's management, made the decision to terminate Shaw and let MEI finish the construction, testing and commissioning work required to complete the project.  Rivers sent a termination letter to Shaw on January 26, 1999.[33]

─────────────────

[30] Rivers, Vol. 5, pp. 72-75; Shaw Exhibit 44, Bailey depo., pp. 62-64; Bailey, Vol. 3, pp. 73-80.

[31] Graves' depo., pp. 53-58.  Kaiser eventually filed a petition for bankruptcy in June 2000.  Shaw Exhibit 41, O'Connor depo., pp. 47-48.

[32] The contract required mechanical completion by the target day of September 4, 1998.  When Kaiser failed to achieve the target date, PCS was entitled to liquidated damages of $11,000 per day for 30 days or less, and $25,000 a day thereafter.  Joint Exhibit 1, Sections 3.2 and 3.3.  PCS began to withhold these liquidated damages in October 1998 at a time when Kaiser was already having cash flow problems.

[33] Rivers', Vol. 4, pp. 238-39, Vol. 5, pp. 78-79; Rivers
(continued...)

Shortly thereafter, Shaw filed this suit against Kaiser and PCS and statements of claim and privilege against PCS under the LPWA.  During the project, all of Shaw's invoices were reviewed on the job site by Kaiser's representatives and then sent to Kaiser's offices in Pittsburgh for further review and auditing.  After the suit was filed Shaw compiled invoices for its work on the PCS project which totaled $11,631,045.20.  Kaiser ultimately agreed to the total and the balance it owed to Shaw for its work on the PCS project.  Their mutual agreement to what was owed for this work became part of the Compromise Agreement between Shaw and Kaiser.[34]

Although the Compromise Agreement between Shaw and Kaiser is not binding on PCS, it is evidence that Shaw and Kaiser agreed to what Kaiser owed Shaw for the reasonable and necessary cost of its work on the PCS project.  PCS presented evidence in an attempt to prove that Kaiser did not voluntarily enter into the Compromise Agreement, and that Kaiser did not actually agree to the amount it owed Shaw under the subcontract and Change Order No. 1.  PCS argued that Kaiser's fragile financial condition compelled it to enter into the agreement regardless of the merits of Shaw's claim.  PCS relied on the testimony of Keith Price, Kaiser's chief executive

---

[33](...continued)
depo., pp. 103-04; Joint Exhibit 14.

[34] Rivers, Vol. 4, pp. 196-97; Vol. 5, pp. 88-107; Rivers depo., pp. 32-39; Randol depo., pp. 106-118; Graves depo., pp. 77-80; Shaw Exhibit 45, Keith Price depo., pp. 25-28, 32-33, 67-68; O'Connor depo., pp. 30, 36-44; Joint Exhibits 6, 7 and 8; Shaw Exhibit 3.

officer at the time, to show that his primary motivation for agreeing to the amount claimed by Shaw was to have Shaw remove its liens against PCS, and to obtain the return of the weld maps, quality certificates and other documents that were removed from the job site by Shaw.[35]

This evidence establishes that Kaiser was in a poor bargaining position at the time because of its overall grave financial condition and its desire to obtain the project documents.  But the evidence does not establish fraud or duress, or that Kaiser did not voluntarily consent to enter into the Compromise Agreement and actually agree to what were the reasonable and necessary costs owed to Shaw under the original subcontract and Change Order No. 1.

PCS also relied on the expert testimony of William Kelly, and evidence that Shaw's work force performed inefficiently after Change Order No. 1.  However, collectively this evidence is not entitled to much weight because it is not supported by the undisputed facts that existed during and in the months immediately following Shaw's work at the PCS site.

For example, Rivers and others testified that after the

_____

[35] PCS Exhibit 43, Price depo, pp. 17, 28-30, 35-36, 49-50, 67, 84.  Price testified that he never had any discussions with PCS, but he knew from his experience that the plant would not be able to start up without the quality certification documents.  *Id*., pp. 45-49.  Bailey's testimony establishes that PCS ultimately had a third party inspector, Robert Eppinett, review the documents in Shaw's custody.  The inspector reported to PCS that the documents were in order and met the regulatory requirements.  On that basis PCS determined that the inspection and report by Eppinett were sufficient to start up the plant.  Bailey, Vol. 3, pp. 34-39, 65-70.

contract was changed from lump sum to cost-plus Shaw performed inefficiently and its work was defective.  They testified that MEI had to be brought in, Shaw workers were standing around, there was poor coordination between the fabrication shop and the job site, deficient work by Shaw had to be repaired, and generally Shaw's productivity deteriorated or went flat.  Yet, there is no contemporaneous evidence that Shaw was ever back charged for any delay or defective work, that any analysis or report was ever done during or after the project which showed that the delay or cost overruns on the job were caused by Shaw, or that any of Shaw's invoices included in the total agreed to by Kaiser were not approved or were rejected because they were unreasonable, unnecessary or excessive.[36]

There is also no persuasive evidence that Shaw's poor performance either created the need to bring MEI on the job or caused Shaw to be removed from the project in January 1999. Rather, the credible evidence established that MEI was brought in because the project was behind schedule due to Kaiser's engineering errors; PCS was assessing liquidated damages against Kaiser; Kaiser was not paying Shaw timely and Rivers knew or believed Shaw was about to quit work on the project due to nonpayment by Kaiser. Kaiser's decision to have MEI finish Shaw's work was motivated by

---

[36] Rivers, Vol. 4, pp. 206, 217, 220, Vol. 5, pp. 88-122; Rivers depo., pp. 32-39, 49-50, 56-62, 71-72, 74, 84-88, 97-129, 174-76; Bailey, Vol. 3, pp. 24-29, 58-61, 65; Philpot, Vol. 4, pp. 127-165; Randol depo, pp. 106-118, 122-24; Volentine, Vol. 1, pp. 108-21, 124-28, 156-57, 159-62, 165-66.

the desire to reduce the delay and disruption which would be caused by Shaw walking off the job at a time of its choosing.

Kelly essentially stated that he viewed the work with the assumption that it was performed in a usual and customary manner, under ordinary conditions.  This assumption is not supported by the facts.  Kelly conceded that his estimate did not take into account Kaiser's deficient, substandard engineering.  Nor did his analysis consider or evaluate the inefficiencies caused by Kaiser's massive and multiple revisions to the engineering design for the piping and pipe supports.  Thus, Kelly's testimony is entitled to minimal weight in evaluating the reasonable and necessary cost of Shaw's work.[37]

Shaw established by a preponderance of the credible evidence that Shaw and Kaiser mutually agreed to exceed the NTE stated in Change Order No. 1.  This finding is supported principally by the fact that (1) Kaiser never affirmatively advised Shaw at any time that it could not exceed the NTE amount; (2) Kaiser never advised Shaw that it was exceeding the NTE amount and should cease working

---

[37]  William Kelly, Vol. 6, pp. 77, 96-101, 103-04, 109-113, 116, 120-22, 124, 126, 196-97.  For example, Kelly testified that the project had an excessive number of punch list items, but he could not testify that any item was the fault or responsibility of Shaw or was caused by Kaiser's engineering errors.  Kelly stated that the project could have been completed by early December, but he did not review the critical path schedules and could not tell whether the responsibility for any delays should be laid on Shaw. Kelly also testified that his estimate was based only on the final revised drawings, which were cumulative and incorporated the earlier revisions.  He acknowledged that he did not assess the cost of work that had to be undone and redone.

or reduce its workforce; (3) Kaiser never advised Shaw that it was invoicing for, performing or reporting work that was not reasonable or necessary; (4) Kaiser's chief executive officer later agreed that Shaw was owed an amount exceeding the NTE amount; and (5) Kaiser actually paid Shaw more than the NTE amount. Shaw established by a preponderance of the credible evidence that the reasonable and necessary costs for its work are represented by the total of the invoices for the project - $11,631,045.20 - the amount listed in the joint exhibits and Exhibit A which was attached to the Compromise Agreement between Shaw and Kaiser.[38]

With regard to the principal amount, Shaw asserted that it proved the unpaid principal amount of the price of its work as of May 15, 2000 was $1,779,612, and that it is entitled to this sum plus legal interest from May 16, 2000 until paid.[39] The calculation proposed by Shaw shows a total subcontract balance of $5,238,217.90. However, full credit for each monthly payment made by Kaiser is not applied to the principal amount. Instead, the monthly balances include accrued interest on the unpaid invoices from the date the suit was filed, and Shaw then claims interest from the date of Kaiser's last payment, May 15, 2000.

The computation on which Shaw relies may represent a correct calculation/allocation of payments by Kaiser pursuant to the

---

[38] Shaw Exhibit 3; Joint Exhibits 7 and 8.

[39] Shaw relied on Shaw Exhibit 55.

Compromise Agreement between Kaiser and Shaw.[40]  Nevertheless, Shaw failed to establish that the unpaid principal amount of the price of its work includes this accrued interest.

PCS will be given full credit for the 13 payments of $291,012.11 each against the subcontract balance owed for the reasonable and necessary cost of Shaw's work.  The total of these 13 payments is $3,783,157.43.  Subtracting this amount from $5,238,217.90 leaves a net unpaid principal balance of $1,455,060.47.  Shaw is entitled to judgment against PCS for this amount, plus interest from the date of judicial demand, as explained below.

**Lien Waivers and Mitigation**

PCS argued that Shaw either has no claim or a reduced claim because Shaw executed waivers after filing its liens and failed to mitigate the loss caused by Kaiser's nonpayment.  Neither of these arguments is supported factually or legally.

PCS asserted that Shaw's claim is negated or reduced because six waivers that exceeded the amount claimed in this suit were executed by Shaw after it filed its liens.[41]  Shaw contended that the lien waivers relied on by PCS are clearly conditional and

---

[40] Under the compromise agreement two of the 20 monthly payments of $291,012.11 were for interest.  Thus, the judgment against Kaiser for $5,820,242.20 was without interest.  Randall Gregory, Vol. 2, pp. 150-53; Shaw Exhibit 3; Record document number 14.

[41] PCS Exhibit 11.  PCS cited the six releases in February 1999 which totaled $1,633,688.39.

partial waivers which would only take effect when the specific invoice amount was paid.  Because their claim against PCS only seeks payment for unpaid invoices, Shaw maintained that the partial release/waivers cannot operate to reduce any obligation PCS has under the LPWA.

PCS's arguments are unpersuasive.  It is clear from the release and waiver of lien forms relied on by PCS that each is conditioned on payment of the sum stated in the release.  The release only releases the owner if the subcontractor actually receives the payment for the invoice.  PCS did not establish that Shaw received the partial payment amounts stated in any of the releases.

PCS did not contest that the releases were conditioned on payment, but asserted that the releases are enforceable even if the subcontractor failed to get paid.  This interpretation is contrary to the plain language of the release, and PCS failed to cite any controlling or persuasive authority to support such a reading.  The Alabama state court case cited by PCS is not convincing.[42]  The Alabama court did not interpret the conditional language at issue here.  Moreover, nothing in the decision indicates that the court would have enforced the release in the absence of payment to the subcontractor of the amount stated in the release.[43]

---

[42] *Wayne J. Griffin Elec., Inc. v. Dunn Const. Co.*, 622 So.2d 314 (Ala. 1993).

[43] In *Griffin*, the subcontractor submitted claims for extra
(continued...)

PCS also argued that it is entitled to an offset because Shaw breached the duty to mitigate damages by not diligently pursuing its claim against Kaiser in Kaiser's bankruptcy proceedings. PCS relied on the general principle in Louisiana Civil Code Article 2002, which states that when an obligee fails to make reasonable efforts to mitigate the damage caused by the obligor's failure to perform, the obligor may demand that the damages be reduced accordingly. PCS did not cite any authority which applies this principle in the context of the LPWA,[44] or otherwise indicates that the subcontractor's claim/recovery against the owner under LSA-R.S. 9:4802.A(1) is dependent on continued efforts to seek payment under its contract.[45] Furthermore, PCS did not present any admissible

---

[43](...continued)
compensation to the general contractor for delays that occurred prior to the release. The court did not mention whether the subcontractor received the payment specified in the release, which would give "full force and effect" to the document. Since the court found that the release operated to relieve the contractor and owner from any and all claims which arose before the execution of the release, the only reasonable assumption is that the payment was received by the subcontractor. 622 So.2d at 317.

[44] A Louisiana appeals court has specifically rejected such a duty under the LPWA. In *Jefferson Door Co., Inc. v. Forman Construction, Inc.*, 02-941 (La.App. 5 Cir. 12/30/02), 836 So.2d 552, 554, *writ denied*, 2003-0318 (La. 4/4/03), 840 So.2d 1220, the defendant owners argued that the material supplier had a duty to mitigate damages with respect to the amount protected by the lien. The court rejected the argument stating that "[t]o impose such a requirement would thwart the purposes of the Private Works Act." The court also noted that the law already provided mechanisms by which property owners could protect themselves.

[45] The *Gifford Hill* case cited by PCS does not address any duty to mitigate under § 4802.A(1). *Gifford Hill & Co., Inc. v. Harper*, 262 So.2d 842, 845 (La.App. 2 Cir. 1972). The court decided that
(continued...)

evidence to establish what Shaw would have recovered if it had pursued payment from Kaiser in the bankruptcy proceeding.

**Interest**

Shaw relied on Louisiana Civil Code Article 2000[46] and claimed that it is entitled to interest from the date of judicial demand until paid.  PCS argued that the amount that Shaw is owed for the price of its work is disputed and will not be finally determined until the date of judgment.  Therefore, PCS argued, interest should be calculated from the date of judgment and not the date of judicial demand.  In the alternative, PCS argued that interest should run from December 2000 because that is when its obligation to pay Shaw arose - when Kaiser failed to pay and the Kaiser bankruptcy closed.

Considering the law applicable to an award of prejudgment interest, the arguments and cases cited by PCS are unavailing.[47]

---

[45](...continued)
the owner had a right to claim a credit for any amount the subcontractor might recover in the general contractor's bankruptcy proceedings.  The court reserved the owner's right to do so because no payments had yet been made in the bankruptcy.  Clearly, the right to claim a credit in *Gifford Hill* was intended to prevent any double recovery.

[46] Article 2000 provides in relevant part:
When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500.

[47] All of the decisions relied on by PCS have been reviewed. The facts and issues in the cases are not sufficiently similar to
(continued...)

It is irrelevant that PCS disputed its liability and the actual amount it owed to Shaw under the LPWA throughout this case.

Shaw filed its amended statement of lien and privilege on February 17, 1999 and suit was filed on February 23, 1999. Shaw argued that legal interest should be awarded from the date of judicial demand. Considering all the circumstances, the court finds that Shaw's demand for an award of legal interest from the date of judicial demand is supported by Louisiana statutory authority and court decisions, and is reasonable in this case.

### Conclusion

Accordingly, judgment will be entered in favor or plaintiff Shaw Constructors, Inc., and against defendant PCS Nitrogen Fertilizer, L.P., in the amount of $1,455,060.47, with legal interest thereon from February 23, 1999 at the annual rates provided by Louisiana law until the date of judgment, and thereafter as provided by 28 U.S.C. § 1961.

Baton Rouge, Louisiana, March 26, 2008.

*Stephen C. Riedlinger*

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE

---

[47](...continued)
the present case to be persuasive.